James **MURPHY**, Appellee,

v.

Rachel **MELTON** and Richard **Couch**, Appellants.

No. 51130.

Court of Appeals of Oklahoma, Division No. 2.

Dec. 26, 1979.

Rehearing Denied Jan. 7, 1980.

Certiorari Denied Feb. 19, 1980.

Released for Publication by Order of Court of Appeals Feb. 21, 1980.

Paul M. Vassar, Vassar, Craig & Vassar, P. C., Chandler, for appellee.

Larry K. Lenora, Erwin & Butts, P. C., Chandler, for appellants.

BRIGHTMIRE, Judge.

For well-nigh 40 years, says plaintiff, he has been using a rutty road on defendant's farm to reach the southwest corner of his own adjoining quarter section of Lincoln County land. But in May 1976 his neighbor's husband told him he was going to be "shut out" and prohibited from further use of the road. John Murphy then brought this lawsuit asking the court to quiet title in him to an easement in the roadway. The trial court granted the requested relief and the burdened land owner appeals.

I

In its essential aspects the evidence is that Murphy acquired his 160 acres in 1944 after occupying it as a tenant farmer for 14 years. Adjoining this quarter section to the south was a 110 acre tract inherited by Bill Dye in the twenties. The Dye place was fenced and had a road running north and south along the west boundary. According to Murphy, Dry Creek cuts diagonally across his property from northwest to southeast and he estimated it to be some 60 feet wide and 15 feet deep. For many years he was able to take farming equipment to the southwest corner of his property by traveling a section line road along the east side of his acreage, thence westward along a road through the southern portion of his land and across a bridge spanning the creek.

In 1946 the Dry Creek bridge "washed out." Instead of replacing it plaintiff looked for another way to reach his southwest corner. For a time he used a road through the land of neighbor Tipton to the west. Eventually, he says, Tipton "shut me out" and he began using another neighbor's way, the Dye road, because, he says, he had no other way of getting to his southwest corner.

The Dye road was about 30 or 40 feet wide. It was improved by Dye many years ago for his own use and, according to Murphy, when the Turner Turnpike was built "he [Dye] got some bridge cement tiling (surplus given to him by contractor), and taken down there and fixed the bridge down there so we could cross that flue." (emphasis added) Dye also installed a gate at the road's entrance and, although it was never locked, plaintiff had to open and close the gate every time he used the road.

Murphy denied he ever asked the late Bill Dye or anyone else if he could use the road. He said that Dye had seen him use the road "a lot of times" for hauling hay and moving

tractors. Following Dye's death in about 1968 his daughter, defendant Rachel Melton, became part owner of the land. Plaintiff said he had seen her on the property but had never asked her permission to use the road either. The Dye farm was rented to Richard Couch, the other defendant, who plaintiff said had voiced no objection to his use of the road.

The foregoing is Murphy's evidence in its best light. And it begets, he contends, a legal presumption that his long usage was adverse thus vesting in him a prescriptive easement on the road—a presumption which casts upon defendants the burden of proving the use was permissive rather than adverse if they are to defeat the easement. Although defendants presented certain contradictory evidence—i. e., the Dye gate was locked after 1968 as well as other proof aimed at impeaching some of Murphy's assertions—we need not, in view of the legal principles resolvent of the evidentiary question presented, concern ourselves with evidence other than that favorable to Murphy and consider it true as the trial court found it to be when he concluded Murphy owned a 30 foot road right-of-way easement running the entire length of Melton's western boundary.

## II

■ A review of the cases deciding prescriptive right-of-way disputes both in English and American courts discloses mainly no unanimity and a complete lack of uniformity.[1] Because the litigants in such cases have frequently been without evidence of material facts courts were wont to fill the void with presumptions of one kind or another.[2] In this state, however, the high court has looked upon easements by prescription with disfavor "because they

necessarily work losses or forfeitures of the rights of others."[3] Consequently on the shoulders of one claiming a prescriptive easement on another's land has been placed the traditional burden of proving his claim and to do so by establishing "every legal element required to constitute prescription" in land occupational cases i. e., the land must have been used for the statutorily prescribed period "adversely under claim or color of right."[4] The philosophy underlying this result is responsible for several realisms, for instance, the view that maintaining a gate across a road through one's farm is a fact from which an inference may be drawn that those using the road do so with the owner's permission.[5] And, of course, a mere permissive use of a way over another's land can never ripen into an easement regardless of however long indulged.[6] Moreover, if another's land is indeed used under a claim of right, for the claim to be operative it must be something more than merely subjective—it must be shown to have been known to the servient estate owner for the statutory period.[7]

## III

■ Here Murphy stated that he opened and closed Dye's gate when he used his neighbor's road—a fact, it seems to us, much more consistent with a license than a claim of right. Murphy did not swear that he used the road from the beginning either as a trespasser or because he thought he had a right to. He did not testify that Dye ever made an objection to his use of the road following which he continued to use it notwithstanding. He did not suggest that Dye ever entertained for one minute the idea that Murphy harbored the thought that he had a legal right to cross the former's ground. In fact, he did not testify to any fact or circumstance inconsistent with a

1. See, for example, discussion in *Zollinger v. Frank*, 110 Utah 514, 175 P.2d 714, 170 A.L.R. 770 (1946).

2. A notorious one—and the one Murphy relies on—is discussed but not applied in *Friend v. Holcombe*, 196 Okl. 111, 162 P.2d 1008 (1945).

3. *Zimmerman v. Newport*, Okl., 416 P.2d 622 (1966); *Irion v. Nelson*, 207 Okl. 243, 249 P.2d 107 (1952).

4. *Board of County Commissioners v. Lloyd*, Okl., 322 P.2d 406 (1958); *Thomas v. Morgan*, 113 Okl. 212, 240 P. 735 (1925).

5. *Irion v. Nelson, supra* note 3.

6. *Friend v. Holcombe, supra* note 2.

7. Id.

permissive use of the road. Indeed, the facts here make it appear much more likely that Dye followed a "good neighbor policy" by permitting Murphy's use of the road—a kindness that should not now be rewarded with a never intended judicial conveyance of an interest in the Dye land. No fact or reason has been shown why we should consider Murphy's use of the road to have been other than permissive. Under these circumstances it would be manifestly unjust for us to permit Murphy to come along after the lips of Dye have been sealed by death and acquire an interest in his neighbors' land based on no more than a judicial presumption—a presumption, incidentally, that is at war with basic human nature and common sense.

### IV

In our opinion the judgment below is supported by neither law, logic or fairness and it is therefore reversed and judgment is entered for defendants.

NEPTUNE, J., concurs.

BACON, P. J., dissents.